THE STATE EX REL. AK STEEL CORPORATION, APPELLANT, *v.*

DAVIS ET AL., APPELLEES.

[Cite as *State ex rel. AK Steel Corp. v. Davis,*

123 Ohio St.3d 458, 2009-Ohio-5865.]

*Workers' compensation — Violation of specific safety requirement — Former rule's definition of "feed rolls" strictly construed in favor of employer.*

(No. 2008-1962 — Submitted September 15, 2009 — Decided November 12, 2009.)

APPEAL from the Court of Appeals for Franklin County, No. 07AP-687, 2008-Ohio-452.

_____

**Per Curiam**.

{¶ 1}  Appellant, AK Steel Corporation, challenges appellee Industrial Commission of Ohio's determination that it violated a specific safety requirement that caused appellee Cheryl L. Davis's injury.  Davis was hurt on a mill that tempered coils of stainless steel. An expert described the mill:

{¶ 2}  "This unit consists of two unguarded counter-rotating work rolls which receive coil stock from a payoff reel, pulls it in and rolls it to improve the hardness and surface finish.  After going through the work rolls the stack is rewound on the recoiler."

{¶ 3}  The payoff reel was on the mill's entry side, where the operator's helper typically stood.  The opening on this side was 32 inches wide and 38½ inches high, and the distance from the payoff reel to the work rolls was approximately 43 inches.  The work rolls were separated from the payoff reel by a large board that, in some respects, resembled a table.  Its main function is not

certain from the record, but it is clear that, secondarily, it prevented anyone from moving or standing between the payoff reel and the work rolls.

{¶ 4} The two work rolls were stacked vertically. The distance between the two was less than the thickness of the steel sheeting, so the steel was tempered as it passed through. The two rolls were powered by a 350-horsepower mill drive on the bottom roll. There was no permanent motor on the top roll, but a drive shaft could be inserted to allow the operator to jog the rolls if necessary. The recoiler was independently powered by a 100-horsepower tension drive.

{¶ 5} The mill had two operating modes. When the mill was in polish mode, the two work rolls were outrunning. This made it impossible for a person to be caught between the mill's work rolls. When in production, i.e., tempering, mode, the two work rolls were inrunning, which created a nip point approximately 46 inches from the payoff reel. The configuration of the machine and the presence of the board suggested that the nip point was not easily accessible, but it is undisputed that it was not guarded.

{¶ 6} The mill, when in production mode, could move between 250 and 500 feet of steel per minute, which created an inadvertent hazard. At that speed, it was extremely difficult to see that the rolls were moving because the surface of the rolls was so uniform and reflective. As one operator stated, it looked like "two mirrors turning." The machine, moreover, was silent when it was running. Operator Scott McKee described his experience with the temper mill:

{¶ 7} "You've got to remember that those rolls are turning because there is no buzz, no bells, no noise.

{¶ 8} "You can walk by, you can look and, if they don't have – there's [sic] no marks, nothing to let you know but your own experience that you've turned that [sic] rolls on. * * * [Y]ou always have to be aware."

{¶ 9} Two people were routinely assigned to the mill — an operator and a helper. One of the operator's key responsibilities was to make sure that the

work rolls were always clean, and there were two approved ways to clean them. One was to reverse the rolls' direction by putting the mill in polish mode and then using a long squeegee to remove the impurity. The other was to turn the mill off and to wipe away any spot by hand. Under no circumstances was an employee ever to touch a moving work roll with his or her hand.

{¶ 10} On November 13, 2002, McKee was assigned to operate the mill, and Davis was assigned as his helper. The two were preparing for the shift's first production run when Davis apparently turned from the mill to grab her coffee. At the same time, McKee turned the mill on in production mode and immediately commented that there was a spot on one of the work rolls. Davis, unaware that the mill was on, grabbed a rag and, in her own words, "stood on [her] tiptoes and leaned in and attempted to wipe [the spot] off." Before McKee could yell a warning, the inrunning rolls grabbed the rag and, with it, Davis's hand. McKee immediately hit the emergency stop, but it was too late to prevent injury.

{¶ 11} After her workers' compensation claim was allowed, Davis filed an application for additional compensation, ultimately alleging that AK Steel had violated a specific safety regulation that required that "[p]ower-driven feed rolls, when exposed to contact, shall be guarded so as to prevent the hands of the operator from coming into contact with the in-running rolls at any point." See Bulletin 203, Section 207, in effect when the mill was installed. Because the nip point was not guarded, the commission granted Davis's application and denied rehearing.

{¶ 12} AK Steel filed a complaint in mandamus in the Court of Appeals for Franklin County. The parties debated, among other things, whether the mill's two work rolls were "feed rolls" as defined in Bulletin 203, Section 2.8. That provision defined "feed rolls" as "rolls *which perform no other function* than to feed material to the point of operation." (Emphasis added.) AK Steel offered two responses, one of which was that because the work rolls also tempered the steel as

it passed through, the rolls were not the single-function apparatus defined in Section 2.8.

{¶ 13} The court of appeals acknowledged that the rolls performed two functions. It held, however, that this court's 1984 decision in *State ex rel. Harris v. Indus. Comm.* (1984), 12 Ohio St.3d 152, 12 OBR 223, 465 N.E.2d 1286, expanded the definition of "feed rolls" to include rolls that performed a dual or secondary function. The writ was denied, and AK Steel has appealed to this court as a matter of right.

{¶ 14} The court of appeals acknowledged that the work rolls performed more than one function but considered that to be immaterial based on *Harris*. The appeals court interpreted *Harris* as expanding Bulletin 203's definition of feed rolls to encompass rolls that had multiple functions. AK Steel has now appealed as a matter of right, and we now take this opportunity to clarify *Harris*.

{¶ 15} Harris was injured while cleaning an offset printing press. He applied for additional compensation, asserting that his employer had violated Ohio Adm.Code 4121:1-5-05(H), a successor version of the specific safety requirement now at issue. The commission denied his application after finding that the ink rolls were not feed rolls because they performed more than one function. This court on appeal acknowledged both that a feed roll, by definition, could perform just one function and that the ink rolls had multiple functions, but it nevertheless characterized the ink rolls as feed rolls:

{¶ 16} "This, [appellees] contend, illustrates a secondary function which, according to Ohio Adm.Code 4121:1-5-01(B)(13), feed rolls cannot perform.

{¶ 17} "Appellant [claimant] submits that the clear facts of the case illustrate that the ink rolls are, in fact, feed rolls. We agree. Ohio Adm.Code 4121:1-5-[01](B)(43) defines the 'point of operation' as 'the area of the press where material is actually positioned and work is being performed during any process * * *.' This definition, although referring particularly to mechanical

power presses, provides a more sensible approach to the problem presented by the facts of the instant appeal. The ink rolls in question clearly feed material to the area of the press where work is being performed during the printing process.

{¶ 18} "The commission has the discretion to interpret its own rules; however, where the application of those rules to a unique factual situation gives rise to a patently illogical result, common sense should prevail. Appellant's contention that Ohio Adm.Code 4121:1-5-05(H) was violated is well supported by the facts. The commission abused its discretion in determining otherwise." *Harris,* 12 Ohio St.3d at 153, 12 OBR 223, 465 N.E.2d 1286.

{¶ 19} Contrary to the court of appeals' interpretation, *Harris* did not expand the single-function requirement; it never substantively addressed it, choosing instead to rely on an inapplicable definition of "point of operation," from which it concluded that the ink rolls were feed rolls. This reasoning violated three key tenets. First, it did not strictly construe the specific safety requirement against its applicability to the employer. An award to an employee for a violation of a specific safety requirement ("VSSR") is a penalty to the employer, and hence any doubts concerning the applicability of a specific safety requirement must be resolved in the employer's favor. *State ex rel. Burton v. Indus. Comm.* (1989), 46 Ohio St.3d 170, 172, 545 N.E.2d 1216. Second, by failing to address the exclusion of dual-function rolls from the definition of "feed rolls," the *Harris* court did not construe the requirement in a way that would have plainly apprised the employer of its legal obligations. *State ex rel. Trydle v. Indus. Comm.* (1972), 32 Ohio St.2d 257, 61 O.O.2d 488, 291 N.E.2d 748, paragraph one of the syllabus. Obviously, when a requirement clearly confines protection to a single-function machine, an employer with a multifunction machine would have no expectation that the requirement also covers it. Finally, *Harris* in effect deleted language from the administrative rule when it ignored the single-function

limitation of the definition. This, too, was improper. *State ex rel. Lee v. Karnes*, 103 Ohio St.3d 559, 2004-Ohio-5718, 817 N.E.2d 76, ¶ 25-27.

{¶ 20} We accordingly clarify that the limitation to a single function is still a part of the definition of "feed rolls" in Section 2.8 of Bulletin 203. The commission therefore abused its discretion in implicitly finding that the temper mill's work rolls were "feed rolls."

{¶ 21} The judgment of the court of appeals is hereby reversed. We issue a writ of mandamus ordering the commission to vacate its order allowing a VSSR award and to issue an order denying the award.

Judgment reversed

and writ granted.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

_____

Frost, Brown, Todd, L.L.C., Christine L. Robek, and Robert A. Dimling, for appellant.

Stocker Pitts Co., L.P.A., Thomas R. Pitts, and M. Scott Kidd, for appellee Cheryl Davis.

Richard Cordray, Attorney General, and Sandra E. Pinkerton, Assistant Attorney General, for appellee Industrial Commission.

_____